DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Gary Y, Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **'23CV0815 L      DDL** |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| MATTHEW J. WERTHE (dba HSR Wealth Management), | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2.     Defendant Matthew J. Werthe ("Werthe") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of

the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. §§ 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Werthe resides in this district.

## SUMMARY

4.     This case is about a "cherry-picking" scheme carried out by Werthe, an investment adviser doing business as HSR Wealth Management ("HSR"), a sole proprietorship that Werthe solely owned and controlled.

5.     Between in or around May 2021 and March 2022, Werthe dba HSR managed approximately $12 million for approximately 54 clients.  During this time, Werthe had discretionary authority over his clients' investment accounts, meaning he had the authority to make investment decisions and execute trades on his clients' behalf.  Werthe executed nearly all of these trades through what is commonly called a "block trading account," which allowed him to place a single stock trade and later allocate portions of that stock trade among the various accounts over which he had discretionary trading authority.  These allocations could be submitted to the brokerage firm at the end of the trading day, so Werthe had the opportunity to "cherry-pick"—that is, to disproportionately allocate winning trades to his personal account (the "Werthe account"), and to disproportionately allocate losing trades to all other accounts, which were almost all client accounts (the "client accounts").

6.     Werthe used that opportunity to engage in fraud.  For approximately ten months, Werthe disproportionately allocated profitable trades to the Werthe account, and disproportionately allocated unprofitable trades to his clients' accounts.  As a result, Werthe reaped substantial profits at his clients' expense, violated the fiduciary

duties he owed to his clients, and violated the antifraud provisions of the federal securities laws.

7.      Further, during this same period, Werthe made false and misleading representations to clients and prospective clients, including that: he would not personally trade in the same securities as those he traded on behalf of his clients, HSR did not aggregate trades, HSR did not "typically" aggregate trades, and the broker-dealer with custody over his clients' accounts ("Broker A") was cutting ties with HSR for reasons other than Werthe's suspicious trading activity.

8.      In total, Werthe's cherry-picking scheme enabled him to obtain over $400,000 for his own account.  At the same time, the client accounts suffered losses of over $500,000 because of Werthe's fraud.  Notably, both the California Department of Financial Protection and Innovation ("DFPI") and Broker A had repeatedly reached out to Werthe about his trading activity and/or false representations, beginning in June 2021.  Werthe's cherry-picking only ceased in March 2022 when Broker A cut ties with Werthe and HSR.

9.      By engaging in this conduct, defendant Werthe violated the antifraud provisions of Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2).

10.      With this action, the SEC seeks a permanent injunction prohibiting future violations of the federal securities laws, a conduct-based injunction, and an order requiring Werthe to disgorge his ill-gotten gains, along with prejudgment interest, and pay civil penalties.

## **THE DEFENDANT**

11.      Defendant Matthew J. Werthe is a resident of San Diego, California. Since approximately June 2019, Werthe has been the sole proprietor, owner, control person, only employee, and chief compliance officer at HSR.  Prior to 2019, Werthe

worked at an investment advisory firm for six years.

12.    Werthe is a registered investment adviser with California.  According to its March 15, 2022 Form ADV, as of that time, HSR had 54 clients and $12,271,873 in assets under management.

## THE ALLEGATIONS

### A.    Background

13.    Werthe began doing business as HSR in or around June 2019.

14.    Werthe provided a variety of financial planning services to individuals regarding the management of their financial resources based upon their financial situation, goals, and objectives.

15.    At all relevant times, Werthe was an investment adviser under Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), because he provided investment advice for compensation to his clients regarding securities.

16.    Werthe provided investment advice by using his discretionary authority over his clients' accounts to buy and sell securities.  He received compensation by charging his clients an advisory fee that was a percentage of their assets under management.

17.    Most of the trades that Werthe executed on behalf of clients were through a block trading account at Broker A, the custodian of the assets under HSR's management.

18.    HSR's block trading account at Broker A allowed Werthe to place a single trade in a stock through the block trading account, and later that same day, allocate portions of that trade to multiple client accounts and/or his personal account.

19.    Werthe was the only person at HSR who allocated trades executed in the block trading account.

### B.    The Cherry-Picking Scheme

20.    From approximately May 2021 through approximately March 2022, Werthe misused the block trading account at Broker A to engage in a fraudulent

scheme to defraud HSR's investment advisory clients by cherry-picking and disproportionately allocating profitable trades to his own personal account. In doing so, Werthe defrauded his clients and violated the fiduciary duties that he owed to them.

21.     Werthe carried out this scheme by executing trades in the block trading account and taking advantage of the time he had to allocate those trades in order to determine the security's intraday performance.

22.     For example, when the price of a stock rose between the time of the trade and the time of the allocation, Werthe disproportionately allocated those profitable trades to his personal account. In most instances when Werthe did this, he sold the security that same day, making it a day-trade and locking in the profit.

23.     By contrast, when the price of a stock went down between the time of the trade and the time of the allocation, Werthe disproportionally allocated those unprofitable trades to the client accounts as long positions (*i.e.*, stocks to be held in their accounts).

24.     This scheme, by its very nature, was inherently deceptive because cherry-picking is virtually impossible for clients to detect on their own. They generally are unable to see how their adviser allocates trades and rely on their adviser to meet his fiduciary duty of care to provide investment advice that is in their best interest, and meet his fiduciary duty of loyalty by putting their financial interests ahead of his own. Thus, each allocation of a trade based on the security's performance was an inherently deceptive act in furtherance of the scheme.

25.     Werthe's cherry-picking allowed him to make tens of thousands of dollars from a single block trade.

     a.     As one example, on or about September 1, 2021, Werthe used the block trading account to purchase 3,000 shares of Vinco Ventures Inc. stock ("BBIG") at approximately 7:20 a.m. ET for $8.43 per share (for a total of $25,290).

     b.     Then, at 10:20 a.m. ET that same day, Werthe sold all 3,000

shares of BBIG for $9.40 per share (for a total of $28,200).

       c.    At 10:21 a.m. ET, Werthe allocated the 7:20 a.m. ET purchase of 3000 BBIG shares for $8.43 per share in the following way: 2,500 shares were allocated to the Werthe account, and the remaining 500 shares were allocated to one client account.

       d.    At 10:22 a.m. ET, Werthe allocated the 10:20 a.m. ET sale of 3000 BBIG shares for $9.40 per share in the same exact way, rendering both allocations profitable, but much more so for the Werthe account.

26.    Werthe's cherry-picking also allowed him to transfer unprofitable trades, including those resulting in tens of thousands of dollars in unrealized losses, exclusively to client accounts.

       a.    As one example, on or about February 24, 2022, Werthe used the block trading account to purchase 15,000 shares of ProShares Ultra VIS Short-Term Futures ETF stock ("UVXY") at approximately 7:10 a.m. ET for $21.38 per share, for a total of $320,700.

       b.    Then, at 2:50 p.m. ET, when the share price was trading at approximately $17.75 per share, Werthe allocated all 15,000 shares of UVXY to 69 client accounts, rendering this allocation unprofitable.

       c.    At the time of allocation, the client accounts suffered an unrealized loss of $3.63 per share, or $54,450 for all 15,000 shares.

27.    At the time of these allocations, Werthe knew the purchase price of the block purchase and the sale price of the block sale.

28.    In total, during the relevant period, Werthe's allocations through the block trading account resulted in approximately : (1) 86% of trades on behalf of the Werthe account being profitable; and (2) 36% of the trades on behalf of the client accounts being profitable.

29.    During the same period, Werthe's allocations through the block trading account resulted in approximately: (1) a 1.2% or greater rate of return on investments

for the Werthe account; and (2) a -1.27% rate of return on investments for the client accounts.

30.     Notably, on or about September 29, 2021, Broker A contacted Werthe and asked him to stop day-trading through the block trading account, as Broker A needed to review his trading activities.  Werthe confirmed to Broker A that he understood.

31.     Then, on or about October 21, 2021, Broker A again questioned Werthe about his self-serving, day-trade allocations from the block trading account.

32.     During this October 21, 2021 interview, Werthe asserted that he made allocation decisions before any trades are placed, but admitted he had no evidence to prove that claim.

33.     Despite these admonitions, Werthe continued to cherry-pick profitable trades to his own account.

34.     Further, on or about March 4, 2022, Broker A again confronted Werthe about the high profitability of trades allocated to Werthe's personal account.  In response, Werthe admitted that such trades did not "look good."

35.     During this same March 4, 2022 interview, Werthe confirmed again that he did not keep any records of his predetermined allocation decisions.  Specifically, Werthe claimed that he would write down all of his anticipated trade allocations in the morning, but throw those notes away afterwards.

36.     As a result, on or about March 25, 2022, Broker A notified Werthe via letter that: (1) Broker A was terminating its relationship with HSR; (2) no new accounts could be opened on Broker A's platform; (3) Werthe's block account access had been disabled; (3) HSR's block trading account had been closed; and (4) any agreement between Werthe and Broker A was being terminated in or around 90 days.

37.     In its letter to HSR, Broker A's only justification for terminating its relationship with HSR was Broker A's "concerns about trading activity by HSR."

38.     The scheme resulted in Werthe receiving over $400,000.  If Werthe's

account had earned the same return as the average return across all the accounts, he would have lost tens of thousands of dollars, rather than generate any profit.  Thus, Werthe's ill-gotten gains is over $450,000.

### C.    Werthe's False and Misleading Statements

39.    As an investment adviser registered with the State of California during the relevant period, Werthe was required to file a "Form ADV Part 2A" for HSR with the Investment Adviser Registration Depository.  In this form, also known as a brochure, investment advisers are required to write in plain English the types of advisory services offered, the adviser's fee schedule, disciplinary information, conflicts of interest, and the educational and business background of management and key advisory personnel of the adviser.  When filed, the brochures are available to the public.

40.    HSR's brochures were filed approximately four times from 2020 to 2022.  These brochures were provided and/or made available to Werthe's clients. Further, the brochures were publicly available to clients and prospective clients online at the SEC's website.

41.    At all relevant times, Werthe was responsible for reviewing drafts of HSR's brochures prepared by the firm's outside compliance consultant, suggesting changes, and authorizing their filing.

42.    Further, since HSR's inception in June 2019, Werthe has been HSR's sole proprietor, owner, chief compliance officer, and employee and therefore the only person who has had responsibility for its disclosures.

43.    Werthe had ultimate authority over the statements contained in HSR's brochures, including their content and whether or how to communicate them to clients and prospective clients.

44.    HSR's brochures contained materially false and misleading statements concerning its allocation of trades and its management of conflicts of interest relating to Werthe's own personal trading.

### 1. False and misleading statement that Werthe did not transact in same securities as his advisory clients

45.    First, HSR's brochures dated March 23, 2020, November 15, 2021, and March 15, 2022 each stated: "Mr. Werthe does not transact in the same securities for personal accounts as he may buy or sell for Client accounts."

46.    This statement was false and misleading during the relevant period because all or nearly all of Werthe's personal trades during this time were in the same securities that he traded on behalf of his clients.

47.    Indeed, on or about June 22, 2021, a representative from DFPI had contacted Werthe, and informed him that this portion of HSR's brochure needed to be corrected to state that Werthe did personally trade in the same securities as those he bought and sold on behalf of his clients.

48.    Additionally, as mentioned above, on or about October 21, 2021, Broker A asked Werthe about this statement, noting that Broker A's data showed Werthe to be day-trading "alongside clients in the same securities."

49.    A reasonable client would have considered it important that, in contrast to what was represented in HSR's brochures dated March 23, 2020, November 15, 2021, and March 15, 2022, Werthe was executing personal trades in the same securities that he traded on behalf of his clients.

### 2. False and misleading statement that Werthe and HSR would put clients' interests first

50.    Second, HSR's brochures dated March 23, 2020, November 15, 2021, and March 15, 2022 each also stated the following: "HSR or individuals associated with HSR are permitted to buy or sell for their personal account(s) securities or investment products identical to those recommended to or already owned by Clients. . . .   [A]s part of HSR's fiduciary duty to Clients, HSR and its supervised persons will endeavor at all times to put the interests of the Clients first."

51.    This statement was false and misleading during the relevant period

because Werthe disproportionately allocated profitable trades to his own account and losing trades to client accounts, demonstrably putting his own interests over his clients'.

52.     A reasonable client would have considered it important that, in contrast to what was represented in HSR's brochures dated March 23, 2020, November 15, 2021, and March 15, 2022, Werthe was allocating a disproportionate number of winning trades to himself and losing trades to clients' accounts, and that on several occasions, Werthe allocated better-priced shares to himself when he traded the same security for his own account and client accounts on the same day.

### 3.     False and misleading statement that HSR did not aggregate client trades through block trading

53.     Third, HSR's brochure dated March 23, 2020 stated: "HSR effects transactions for each Client independently and does not aggregate trades."

54.     This statement was false and misleading because Werthe aggregated client trades, and aggregated his own personal trades with client trades through block trading accounts.  Werthe eventually revised this statement, but only after DFPI sent him a Deficiency Letter on October 12, 2021, noting that he should amend the statement.

### 4.     False and misleading statement that "typically," HSR did not aggregate client trades through block trading

55.     Fourth, on HSR's brochure dated November 15, 2021, Werthe revised HSR's firm brochure to state: "HSR typically effects transactions for each Client independently.  At times, when able to and as applicable, the Firm can aggregate trades of accounts."

56.     Once again, even this revised statement was false and misleading because Werthe did not "typically" effect client transactions independently; indeed, to the contrary, Werthe aggregated approximately 93.8% of his clients' trades, in terms of dollars traded.

57.     A reasonable client would have considered it important that, in contrast to what was represented in HSR's brochure dated November 15, 2021, Werthe was aggregating the vast majority, approximately 93.8%, of his clients' trades, in terms of dollars traded.

### 5.     False and misleading statements about Broker A's termination of its relationship with HSR

58.     Fifth, in addition to the misrepresentations in HSR's brochures, Werthe misled clients about the reason for why Broker A was no longer going to be HSR's broker-dealer custodian.  On or about March 27, 2022—after he received the letter from Broker A terminating its relationship with HSR due to "concerns about trading activity"—Werthe sent an email to clients stating, among other things, that Broker A's "service level has decreased dramatically, and its "costs are being added incrementally."

59.     This statement was false and misleading because none of the reasons Werthe provided to his clients, including Broker A's services and costs, were reasons that HSR was severing ties with Broker A.  Rather, as Werthe knew from his various communications with representatives of Broker A and the aforementioned letter, the real reason for the termination was Broker A's "concerns about [Werthe's] trading activity."

60.     A reasonable client would have considered it important that, in contrast to what was represented in Werthe's email to clients in March 2022, Broker A terminated its relationship with HSR due to concerns about Werthe's trading activity.

61.     Werthe obtained money by means of his misrepresentations in HSR's brochures and the March 2022 client email.  Werthe also unfairly and substantially profited from his cherry-picking at the expense of HSR's clients.

### D.     Werthe's Scienter and Negligence

62.     Werthe was a fiduciary for his clients and owed his clients a duty of loyalty.  That duty of loyalty included an affirmative duty of utmost good faith, a

duty to provide full and fair disclosure of all material facts, and a duty to employ reasonable care to avoid misleading his clients.  Werthe also owed his advisory clients a separate duty of care.  His duty of care included a duty to provide investment advice that was in the best interest of his clients, and a duty to seek best execution of his clients' securities transactions.  Despite knowing of these duties, Werthe engaged in cherry-picking.

63.    Further, Werthe was the only person at HSR who had authority to determine how to allocate trades, and all trades placed in HSR's block trading account were allocated by him.

64.    Moreover, based on a statistical analysis of the subject trades, trade allocations, and first-day investment returns, the likelihood that Werthe's disproportionate allocation of profitable trades to his own account and unprofitable trades to client accounts resulted from random chance, as opposed to knowing and intentional conduct, is, at best, less than one in a million.

65.    Additionally, beginning at least in or about June 2021 and continuing through March 2022, Werthe was contacted multiple times about his improper trading practices, but he continued to engage in cherry-picking.

66.    Relatedly, Werthe was also informed by Broker A that it was terminating its relationship with HSR due, at least in part, to Werthe's trading activity.

67.    Werthe accordingly knew, or was reckless in not knowing, that using the block trading account to allocate winning trades to his own account and losing trades to client accounts defrauded his clients and violated the fiduciary duties that he owed to them.

68.    Werthe also acted negligently when engaging in his cherry-picking scheme.  Werthe failed to act as a reasonable person would under the circumstances when acting as his clients' investment adviser, by disproportionately allocating winning trades to himself, and losing trades to his advisory clients.

69.     Werthe further authorized and controlled the content of HSR's brochures and communications to investors.

70.     Werthe accordingly knew, or was reckless in not knowing, that his cherry-picking rendered the disclosures in HSR's brochures and the March 2022 client email false and misleading.

71.     Werthe also acted negligently.  Werthe did not exercise reasonable care when describing HSR's trading and allocation practices in HSR's brochures, or in drafting and disseminating the false March 2022 client email.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

72.     The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

73.     As alleged above, defendant Werthe engaged in a scheme to defraud his clients, and engaged in acts, practices or courses of business that operated as a fraud upon his clients, by cherry-picking profitable trades for his personal account at the expense of his clients despite being questioned about his behavior.  This cherry-picking scheme was inherently deceptive and created the false appearance that first-day losses suffered in client accounts were attributable to market forces rather than defendant Werthe's fraudulent trade allocation practices.  In carrying out this fraud, Werthe engaged in a number of deceptive acts in addition to cherry-picking, including making false and misleading statements in HSR's brochures concerning HSR's trading practices, prioritizing clients' interests over HSR's, and the volume of HSR's aggregated trades.

74.     By engaging in the conduct described above, defendant Werthe, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud;

and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

75.    Defendant Werthe knew, or was reckless in not knowing, that he employed devices, schemes, or artifices to defraud and engaged in acts, practices, or courses of business that operated as a fraud upon persons by the conduct described in detail above.

76.    By engaging in the conduct described above, defendant Werthe violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

77.    The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

78.    As alleged above, defendant Werthe made untrue statements of material fact in HSR's brochures concerning its trading practices, prioritization of clients' interests over HSR's, and the volume of its aggregated trades.

79.    By engaging in the conduct described above, defendant Werthe, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.    Defendant Werthe knew, or was reckless in not knowing, that he made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     By engaging in the conduct described above, defendant Werthe violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

## **THIRD CLAIM FOR RELIEF**

### **Fraud in the Offer or Sale of Securities**

### **Violations of Sections 17(a)(1) and (3) of the Securities Act**

82.     The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

83.     As alleged above, defendant Werthe engaged in a scheme to defraud his clients, and engaged in acts, practices or courses of business that operated as a fraud upon his clients, by cherry-picking profitable trades for his personal account at the expense of his clients despite multiple warnings from regulators and HSR's broker-custodian.  This cherry-picking scheme was inherently deceptive and created the false appearance that first-day losses suffered in client accounts were attributable to market forces rather than defendant Werthe's fraudulent trade allocation practices.  In carrying out this fraud, Werthe engaged in a number of deceptive acts in addition to cherry-picking, including making false and misleading statements in HSR's brochures concerning HSR's trading practices, prioritizing  clients' interests over HSR's, and the volume of HSR's aggregated trades.

84.     By engaging in the conduct described above, defendant Werthe, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

85.     Defendant Werthe knew, or was reckless in not knowing, that he employed devices, schemes, or artifices to defraud and engaged in acts, practices, or

courses of business that operated as a fraud upon persons by the conduct described in detail above, and his conduct in doing so was also unreasonable and therefore negligent.

86.    By engaging in the conduct described above, defendant Werthe violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

<u>**FOURTH CLAIM FOR RELIEF**</u>

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(2) of the Securities Act**

87.    The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

88.    As alleged above, defendant Werthe obtained money by means of untrue statements of material fact in HSR's brochures concerning its trading practices, prioritization of clients' interests over HSR's, and the volume of its aggregated trades.

89.    By engaging in the conduct described above, defendant Werthe, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.    Defendant Werthe, knew, or was reckless in not knowing, that he obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and his conduct in doing so was unreasonable and therefore negligent.

91.    By engaging in the conduct described above, defendant Werthe, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2)

of the Securities Act, 15 U.S.C. § 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

92.     The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

93.     As alleged above, defendant Werthe had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of HSR's clients.  Defendant Werthe breached his fiduciary duty to his clients by carrying out the cherry-picking scheme—which was inherently deceptive and created the false appearance that first-day losses suffered in client accounts were attributable to market forces rather than defendant Werthe's fraudulent trade allocation practices—and by making materially false and misleading statements.  These false and misleading statements included those in HSR's brochures, and also those in Werthe's March 2022 email to clients concerning HSR's move to a different broker-dealer custodian.

94.     By engaging in the conduct described above, defendant Werthe, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

95.     Defendant Werthe knew, or was reckless in not knowing, that he employed devices, schemes and artifices to defraud clients or prospective clients, or engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients, and his conduct in doing so was unreasonable and therefore negligent.

96.     By engaging in the conduct described above, defendant Werthe violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

17

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that defendant Werthe committed the alleged violations.

## II.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Werthe from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## III.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Werthe from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the purchase, offer, or sale of any security other than for his own personal accounts.

## IV.

Order defendant Werthe to disgorge all funds received from his illegal conduct together with prejudgment interest thereon pursuant to Securities Exchange Act of 1934, Section 21(d)(3), (d)(5) and (d)(7), 15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7).

## V.

Order defendant Werthe to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Adviser Act, 15 U.S.C. § 80b-9(e).

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: May 4, 2023

*/s/ Daniel S. Lim*
DANIEL S. LIM
KELLY C. BOWERS
Attorneys for Plaintiff
Securities and Exchange Commission