UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

MATTHEW J. WERTHE dba HSR
WEALTH MANAGEMENT,

Defendant.

Case No.:  23cv0815-L-DDL

**ORDER GRANTING MOTION FOR
SUMMARY ADJUDICATION**

**[ECF No. 26]**

Pending before the Court in this securities fraud action is a motion for summary judgment filed by Plaintiff United States Securities and Exchange Commission ("SEC"). (ECF No. 26.)  Defendant Matthew J. Werthe, proceeding *pro se*, filed an opposition (ECF No. 27) and the SEC replied (ECF No. 28).  The Court decides the matter on the papers submitted without oral argument.  *See* Civ. L. R. 7.1(d)(1).  For the reasons stated below, the motion is granted to the extent of Defendant's liability on the claims alleged in the complaint.

/ / / / /

# I.    BACKGROUND[1]

In June 2019, Defendant Matthew J. Werthe started HSR Wealth Management ("HSR"),[2] a California-registered investment adviser.  Mr. Werthe was the sole owner, employee, and Chief Compliance officer of HSR and was solely responsible for all its day-to-day activities.  He engaged in the business of providing investment advice regarding equity stocks, fixed income securities, bonds, exchange traded funds ("ETFs"), mutual funds, and cash equivalent instruments.  His clients paid him advisory fees based on a percentage of assets under management.  Mr. Werthe had discretionary authority over his clients' brokerage accounts to trade on their behalf without prior permission.  As of March 2022, he had over 50 clients and over $12 million in assets under management.

Defendant conducted most of his clients' securities transactions through a block trading account (the "Block Account") at TD Ameritrade ("TDA").  The purpose of a block trading account is to aggregate multiple clients' trades through a large "block" transaction, and subsequently allocate those trades using an average execution price.  However, it is possible for an investment adviser to abuse the block trading practice by waiting to see whether the stock price rises or falls before allocating the trade not based on an average execution price but on the stock's performance since purchase.

Defendant was solely responsible for placing trades through the Block Account and allocating them between his clients' brokerage accounts ("Client Accounts") and his own brokerage account ("Werthe Account").[3]  TDA was the broker-custodian which held

---

[1]    Unless noted otherwise, background facts are taken from the joint statement of undisputed facts ("ECF No. 29, "JSUF").

[2]    Mr. Werthe and HSR are sometimes collectively referred to as Defendant.

[3]    The Werthe Account and the Client Accounts are sometimes referred to as favored and disfavored accounts, respectively.

23cv0815-L-DDL

the Werthe and Client Accounts, and through which Defendant executed the trades and allocations.

In the fall 2021, TDA's data showed that Defendant was engaged in preferentially allocating day-trades to the Werthe Account. On or about September 29, 2021, a TDA representative told Mr. Werthe that he should avoid trading the same security on the same day as his clients to avoid receiving a better price. On or about October 21, 2021, another TDA representative questioned Mr. Werthe about his block trading, account allocations, and inconsistencies between the representations to Defendant's clients and the actual trading practices. The same representative again spoke with Mr. Werthe on March 4, 2022, and confronted him, among other things, about the broken assurance that he would stop allocating day-trades to the Werthe Account and failure to retain allocation records. On or about March 25, 2022, TDA shut down the Block Account and terminated its relationship with HSR due to concerns about trading activity.

The SEC filed this action alleging that Defendant "cherry picked" the trades, *i.e.* disproportionately allocated trades that were profitable at the time of allocation to the Werthe Account and the trades that were unprofitable at the time of allocation to the Client Accounts. The SEC expert and financial economist Rachita Gullapali, Ph.D., analyzed TDA trading and market quotation data and concluded that Defendant had engaged in cherry picking. The SEC also alleged that Defendant made false or misleading representations to his clients regarding his trading practices.

Based on the foregoing, the SEC alleged five causes of action. In the first cause of action the SEC claims that by cherry picking Defendant engaged in a scheme to defraud his clients and that he engaged in additional deceptive acts by making false and misleading statements. The SEC contends that this conduct constituted fraud in connection with the purchase or sale of securities in violation of 15 U.S.C. §78j(b) and 17

/ / / / /

C.F.R. § 240.10b-5(a) & (c).[4]  In the third cause of action the SEC claims that by the same conduct Defendant also committed fraud in the offer or sale of securities in violation of 15 U.S.C. § 77q(a)(1) and (3).[5]  The first and third causes of action are collectively referred to as the "Fraudulent Scheme Claims."

In the second cause of action the SEC claims that by making false statements to his clients, Defendant engaged in fraud in connection with the purchase or sale of securities in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).  Based on the same alleged false statements, in the fourth cause of action the SEC claims that Defendant also committed fraud in the offer or sale of securities in violation of 15 U.S.C. § 77q(a)(2). The second and fourth causes of action are collectively referred to as the "False Statement Claims."

In the fifth cause of action the SEC claims that by cherry picking and false and misleading statements Defendant breached his fiduciary duty to his clients.  The SEC contends that this conduct constitutes fraud by an investment adviser in violation of 15 U.S.C. §80b-6(1) and (2)[6] (the "Investment Adviser Claim").

The SEC seeks injunctive relief, disgorgement of funds received from illegal conduct, and civil penalties.  The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.  The SEC moves for summary adjudication of liability on all its claims.

---

[4]    Title 15 U.S.C. §78j(b) is sometimes referred to as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").  Title 17 C.F.R. § 240.10b-5, the regulations promulgated under Section 10(b), are sometimes referred to as Rule 10b-5.  They apply to securities buyers and sellers. *Aaron v. SEC,* 446 U.S. 680, 687 (1980).

[5]    Title 15 U.S.C. § 77q(a) is sometimes referred to as Section 17(a) of the Securities Act of 1933 ("Securities Act").  It applies only to securities sellers. *Aaron,* 446 U.S. at 687.

[6]    Title 15 U.S.C. § 80b-6 is sometimes referred to as Section 206 of the Investment Advisers Act of 1940 ("Advisers Act").

23cv0815-L-DDL

## II.    DISCUSSION

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses.  Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7]  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.  As the plaintiff, the SEC has the burden of proof.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *see also Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) ("Where the moving party will have the burden of proof at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

If the moving party carries its burden of production, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The nonmoving party

---

[7]    Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

must do more than simply show that there is some metaphysical doubt as to the material facts[, and] must come forward with specific facts showing that there is a genuine dispute for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Defendant opposing the SEC's summary judgment motion is proceeding *pro se*. Because he is not a prison inmate but "an ordinary *pro se* litigant, [he must,] like other litigants, … comply strictly with the summary judgment rules." *Soto v. Sweetman,* 882 F.3d 865, 872 (9th Cir. 2018).

In ruling on a motion for summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*  "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 651; *see also id.* at 657. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

## A.    The Fraudulent Scheme Claims

The Fraudulent Scheme Claims are based on the allegations of cherry picking and false and misleading statements to clients in violation of Section 10(b) of the Exchange Act, Rule 10b-5(a) & (c), and Section 17(a)(1) and (3) of the Securities Act.

Section 10(b) of the Exchange Act provides in relevant part as follows:

Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—[¶]

/ / / / /

(b) To use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 provides in relevant part:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud, [¶]  or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a) & (c).  Section 17(a) of the Securities Act provides in relevant part:

Fraudulent interstate transactions

(a) Use of interstate commerce for purpose of fraud or deceit

It shall be unlawful for any person in the offer or sale of any securities … by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or [¶]

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1) & (3).

These provisions require proof of (1) a fraudulent scheme, device or artifice to defraud or transaction, act, practice, or course of business that operates as a fraud; (2) in

connection with the purchase, offer, or sale of a security; (3) through use of interstate commerce.  In addition, proof of scienter is required for all, except the claim alleged under Section 17(a)(3) of the Securities Act, which requires only proof of negligence.  *Aaron v. SEC,* 446 U.S. 680, 701-02 (1980).  The SEC provided evidence in support of each element.

### 1.   Scheme to Defraud

The SEC claims that by cherry picking and making false and misleading statements to his clients, Defendant engaged in a scheme to defraud.

### a.    Cherry Picking

The SEC filed voluminous evidence in support of its motion.  (ECF Nos. 26-5 through 26-25.)  Much of this evidence was later subsumed in the joint statement of undisputed facts.  (*See* ECF No. 29.)  Specifically in support of its cherry-picking claim, the SEC provided expert testimony of Rachita Gullapalli, Ph.D.  (ECF No. 26-21, "Report;" ECF No. 26-22, "Supp. Report;" ECF No. 26-3, "Expert Decl.;" Gullapalli Dep.[8]).  Dr. Gullapalli opined that Defendant cherry picked for his own gain the trades he made through the Block Account between May 1, 2021, and March 25, 2022.

Defendant started allocating Block Account trades to the Werthe Account in September 2020; however, only seven such allocations were made before May 1, 2021, when the allocations increased significantly.  From May 1, 2021, until March 25, 2022, more than 90% of Defendant's trades were made in the aggregate through the Block Account rather than directly.[9]  It is undisputed that Mr. Werthe was solely responsible for placing trades through the Block Account and allocating them between the Werthe and

---

[8]     Both sides filed excerpts from Dr. Gullapalli's deposition.  The excerpts can be found at ECF Nos. 26-20; 27; and 28-3.  All excerpts collectively are referred to as "Gullapalli Deposition."

[9]     A direct trade is not allocated because it is made for a specific account rather than in the aggregate.

Client Accounts.  (JSUF ¶ 9.)  The allocation of trades stopped after March 25, 2022, when TDA closed the Block Account.

Dr. Gullapalli analyzed the Block Account trades during the relevant period between May 1, 2021, and March 25, 2022.  These trades involved stocks and ETFs.  After making trades, Defendant allocated them from the Block Account to the Werthe Account and various Client Accounts.  At the time of allocation Defendant could determine whether the investment had increased or decreased in price.  Defendant disproportionately allocated trades that were profitable at the time of allocation to the Werthe Account and trades that were unprofitable at the time of allocation to the Client Accounts.  Defendant allocated trades totaling $33,341,414 (based on the purchase price) to the Werthe Account and earned a profit of $471,885.  He allocated trades totaling $43,846,546 (based on the purchase price) to the Client Accounts, which collectively incurred a loss of $555,485.

Dr. Gullapalli calculated the return earned between the time of purchase and time of allocation for the Werthe Account and the Client Accounts.[10]  This rate is not annualized but represents the average first day return attributable solely to the allocation decisions (the "Allocation Return").  The Allocation Return for the Werthe Account was 1.42% and the Allocation Return for the Client Accounts was -1.27% (a negative return, *i.e.,* a loss).  If all Block Account trades had been allocated equally, all accounts would have had an Allocation Return of -0.11%.

Using two types of statistical analysis, Dr. Gullapalli determined that the difference in performance between the Werthe Account and Client Accounts was not attributable to random chance.  The difference in performance also could not be accounted for by the difference between the short-term highly competitive strategy Mr. Werthe used for his personal account and the long-term buy-and-hold strategy he used for his clients.  Nor

---

[10]    The rate for the Client Accounts is the aggregate rate for all Client Accounts.

was the difference attributable to stock selection, because Defendant was trading in the same stocks for himself and his clients.  Because Defendant had the opportunity to cherry pick the Block Account trades for his benefit, and because the superior performance of the Werthe Account could not be otherwise accounted for, Dr. Gullapalli concluded that Defendant was cherry picking.

Defendant attacks Dr. Gullapalli's opinion on several grounds.  First, he argues that she is not sufficiently experienced to render an opinion about cherry picking because she had never authored a report analyzing cherry picking and because she is not an expert in stock trading.  (*See* Gullapalli Dep. at 10 ("not claiming to be an expert in stock trading").)

A testifying expert must be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  This rule "contemplates a *broad conception* of expert qualifications."  *Hangarter v. Provident Life*, 373 F.3d 998, 1018 (9th Cir. 2004) (emph. in orig.).  In 2001, Dr. Gullapalli earned an M.S. in applied economics and finance at University of California, Santa Cruz.  (Report App'x A.)  In 2012, she earned a Ph.D. in economics at University of California, Berkeley.  (*Id.*)  She has been employed at the SEC as a Senior Financial Economist, Division of Economic and Risk Analysis, since 2012.  (*Id.*)  Her experience, including as a testifying expert, covers economic analysis and statistical analysis regarding market manipulation trading schemes and preferred allocation schemes by investment advisors.  (*Id.*; *see also* Gullapalli Dep. at 9.)  Specifically, she has analyzed ten to twelve cases for cherry picking.  (Gullapalli Dep. at 42.)  Dr. Gullapalli's qualifications lay sufficient foundation of knowledge, skill, experience, training, and education to give expert testimony on the issues addressed in her report.  *See Hangarter*, 373 F.3d at 1016.

Second, Defendant argues that the performance difference between the Werthe and Client Accounts is not due to cherry picking but the difference in investment strategies.  Defendant was using a long-term buy-and-hold strategy for his clients and a short-term highly competitive strategy for his own account.  In trading for his own account, he used

stop-loss and limit orders.  He argues that the fact that time elapsed between the stock trades and allocations, giving him an opportunity to determine whether the price has increased or decreased, is irrelevant to the issue whether he was cherry picking because he was using stop-loss and limit orders which had predetermined criteria for buy and sell prices.[11]

Dr. Gullapalli addressed this issue in her Report.  (Report ¶¶ 46-50; *see also* Gullapalli Dep. at 20.)  The difference in investment strategies, including the use of stop-loss and limit orders when Defendant was trading for his own account, is irrelevant to Defendant's allocations. (Gullapalli Dep. at 40.)  When Defendant was using the Block Account to trade in the aggregate for himself and his clients, he had a choice to allocate the trades between the Werthe and Client Accounts.  Defendant does not dispute this. (*See* JSUF ¶¶ 7-10.)  He does not contend that the use of stop-loss and limit orders obviated the need for allocation.

Alternatively, Dr. Gullapalli's conclusion that the disproportionate returns for the Werthe Account were due to cherry picking rather than the difference in investment strategy is underscored by her analysis of Defendant's direct trade data.  (Report ¶¶ 53-57; *see also* Gullapalli Dep. at 20.)  When Defendant was trading directly for the Werthe Account or a Client Account, no allocations were necessary, thus obviating the opportunity for cherry picking.  The Allocation Return for direct trades on the Werthe Account during the relevant period was -0.27% rather than 1.42% when he allocated trades from the Block Account.  Defendant does not dispute this analysis.

/ / / / /

---

[11]    A stop-loss order is an order placed with a broker to buy or sell a specific stock when it reaches a certain price.  www.investopedia.com/terms/stop-lossorder.asp (last visited 3/4/20205).  A limit order is used to buy or sell a security at a pre-determined price and will not execute unless the security's price meets those qualifications. www.investopedia.com/terms/limitorder.asp (last visited 3/4/20205).  *See also* Gullapalli Dep. at 24.

Third, Defendant argues that Dr. Gullapalli's opinions are incomplete because she did not compare the realized rates of return[12] for the trades allocated to the Werthe and Client Accounts.  (*See* Gullapalli Dep. at 16-17, 36.)  Dr. Gullapalli addressed this issue in her Report.  (Report ¶¶ 15-16 & n.15; *see also* Gullapalli Dep. at 17.)  She calculated the returns earned at the time of allocation to analyze the impact of the allocation decision.  (Gullapalli Dep. at 36.)  She did not include profits and losses earned after allocation because those were caused by factors other than Defendant's allocation decision.  (*Id.* at 17.)  Accordingly, realized rates of return are not relevant to the issue whether Defendant was cherry picking when he allocated trades.

For the foregoing reasons, Defendant's arguments do not raise a genuine issue of material fact regarding cherry picking.  Defendant also has not retained an expert of his own to refute or challenge Dr. Gullapalli's opinions.  (JSUF ¶ 33.)

In his opposition, Defendant offers a general protestation that he did not cherry-pick and did not know the price at the time of allocation.  These statements are alleged in his opposition brief and are not supported by a sworn declaration.  Defendant has failed to file competent evidence in opposition to summary judgment.  *See Soto v. Sweetman,* 882 F.3d 865, 872-73 (9th Cir. 2018).  Moreover, when, as here, the moving party has carried its burden, the nonmoving party:

> must do more than simply show that there is some metaphysical doubt as to material facts.  ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co.,* 475 U.S. at 586-87 (emph. in orig.); *see also Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

---

[12]    A realized rate is earned at the time of sale rather than at the time of allocation. (*See* Report ¶¶ 18 n.18, 21, 23.)

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Viewing the facts in the light most favorable to Defendant, and drawing all reasonable inferences in his favor, Defendant has presented insufficient evidence to raise a genuine issue of material fact regarding cherry picking.

b.    False Statements

In addition to cherry picking, the SEC points to Defendant's false and misleading statements to clients regarding his trade practices. These statements were made primarily in Defendant's Form ADV Part 2A (the "Brochure"), which Defendant distributed to all his clients. (*See* JSUF ¶ 44.)

Form ADV is an SEC registration form for investment advisers and consists of two parts, both of which are available to the public. www.investor.gov/introduction-investing/investing-basics/glossary/form-adv (last visited 3/5/2025). Part 2A

> requires investment advisers to prepare narrative brochures that include … disclosures of the adviser's business practices, fees, conflicts of interest, and disciplinary information. The brochure is the primary disclosure document for investment advisers and must be delivered to advisory clients.

*Id.*; *see also* www.sec.gov/files/formadv-instructions.pdf (last visited 3/5/2025). Defendant reviewed and had final control and authority over the content and wording of the Brochures. (JSUF ¶ 45.)

The March 23, 2020, November 15, 2021, and March 15, 2022, Brochures all stated that

> Mr. Werthe does not transact in the same securities for personal accounts as he may buy or sell for Client accounts; however, HSR has adopted personal securities transaction policies in its Code, which all current and future HSR associated persons must follow. Specifically, the Code requires personnel to report personal trades and holdings and prohibits or requires pre-clearance for certain trades in certain circumstances.

(JSUF ¶ 46.)

/////

1    This statement was false insofar as Mr. Werthe transacted in the same securities for

2 his personal Werthe Account as for his clients.  Defendant admits that the statement was

3 false from May 2020 to August 2021 (JSUF ¶ 48) and does not dispute Dr. Gullapalli's

4 finding that from May 1, 2021, to March 25, 2022, all allocations to Client Accounts

5 were in stocks that were also allocated to the Werthe Account (*id.* ¶ 47).  Defendant

6 admits that he reviewed this statement and should have corrected it but did not.  (*Id.* ¶

7 50.)

8    The March 23, 2020, November 15, 2021, and March 15, 2022, Brochures also

9 stated that

10    HSR or individuals associated with HSR are permitted to buy or sell for their
   personal account(s) securities or investment products identical to those
11    recommended to or already owned by Clients.  Additionally, HSR will not
   cause Clients to buy a security in which HSR or such individuals have an
12    ownership position.  Nevertheless, to mitigate potential conflicts, HSR has
   adopted a Code of Ethics, which outlines the procedures regarding personal
13    trading that must be followed (see details below).  Additionally, as part of
   HSR's fiduciary duty to Clients, HSR and its supervised persons will
14    endeavor at all times to put the interests of the Clients first and at all times
   are required to adhere to HSR's Code of Ethics.
15

16

17

18 (JSUF ¶ 52.)  For the reasons stated in Section a. above, Defendant has not raised a

19 genuine issue of material fact regarding cherry picking.  Accordingly, the statement in the

20 Brochure was false insofar as Mr. Werthe cherry picked the profitable trades for himself

21 and did not put his clients' interests first.

22    Defendant's Brochure dated March 23, 2020, stated that "HSR effects transactions

23 for each Client independently and does not aggregate trades."  (JSUF ¶ 54.)  This

24 statement was updated in the November 15, 2021, Brochure, which stated that "HSR

25 typically effects transactions for each Client independently.  At times, when able to

26 and as applicable, the Firm can aggregate trades of accounts."  (*Id.* ¶ 55.)

27    Dr. Gullapalli found that more than 90% of Defendant's trades were through the

28 Block Account.  (Supp. Report ¶ 2.)  Defendant admits that he "conducted most of his

14

clients' securities transactions through the … Block Account[.]" (JSUF ¶ 6.)  No genuine issue of material fact remains whether the statements about not aggregating trades, whether "typically" or not at all, were false.

Finally, after TDA shut down the Block Account and terminated its broker-custodian relationship with HSR, Defendant informed his clients on March 27, 2022, that "he himself intended to move all of his client accounts to another broker-custodian because TDA's service level had decreased dramatically, and its costs are being added incrementally." (JSUF ¶ 61.)  This statement was misleading because it failed to disclose that TDA had informed Defendant it had shut down the Block Account and was terminating the relationship due to "concerns about trading activity by HSR."  (*See id.* ¶¶ 59, 60.)

Based on the foregoing, the SEC has provided evidence that Defendant repeatedly made false and misleading statements to his clients.  Defendant has not raised a genuine issue of material fact regarding the falsity or misleading nature of these statements.

### c.    Analysis

Section 10b of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance."  15 U.S.C. § 78j(b).  Rule 10b-5 defines manipulative and deceptive devices alternatively as "device, scheme, or artifice to defraud[,]" 17 C.F.R. § 240.10b-5(a), or "act, practice, or course of business which operates or would operate as a fraud[,]" *id.* § 240.10b-5(c).  The same is prohibited by Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1) & (3).  "These provisions capture a wide range of conduct."  *Lorenzo v. SEC,* 587 U.S. 71, 79 (2019).  For example, a device "is simply that which is devised, or formed by design[,]" a scheme "is a project, plan or program of something to be done[,]" and artifice "is an artful stratagem or trick."  *Id.* at 78.

Cherry picking is a practice or scheme by which the investment adviser allocates profitable trades to preferred accounts and unprofitable trades to disfavored accounts. (Report ¶ 5.)  This practice is difficult to detect.  *SEC v. World Tree Fin., L.L.C.,* 43 F.4th 448, 462 (5th Cir. 2022) ("*World Tree*").  It was particularly deceptive to Defendant's

clients because Mr. Werthe had "full and exclusive discretionary authority" over their accounts to trade on their behalf "without prior permission," and he did not keep records of his Block Account allocations (JSUF ¶¶ 5, 39-42).  It was therefore virtually impossible for Defendant's clients to discover preferential allocations.  Defendant further concealed his cherry-picking activity by making false and misleading statements. Defendant's conduct therefore meets the definition of prohibited activity under Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c), and Section 17(a)(1) and (3) of the Securities Act.  *See World Tree,* 43 F.4th at 461.

2. <u>Scienter</u>

Scienter is required to establish violation of Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c), and Section 17(a)(1) of the Securities Act.  *Aaron*, 446 U.S.at 701-02.  Negligence is sufficient for Section 17(a)(3) of the Securities Act.  *Id.; SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir. 2001).

Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  It "can be established by intent, knowledge, or in some cases recklessness."  *SEC v. Platform Wireless Int'l Corp.,* 617 F.3d 1072, 1092 (9th Cir. 2010) ("*Platform Wireless*").  In this regard,

> reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.  [¶ T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even "white heart/empty head" good faith.

*Hollinger v. Titan Capital Corp.,* 914 F.2d 1546, 1569 (9th Cir. 1990) (*en banc*). Scienter may be inferred from circumstantial evidence.  *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n.30 (1983).  "Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the / / / / /

1   adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d

2   1434, 1436 (9th Cir. 1984).

3       Cherry picking necessarily involves knowing and intentional conduct because it

4   consists of a series of deliberate decisions to allocate profitable trades to preferred

5   accounts. *See World Tree*, 43 F.4th at 463-64. According to Dr. Gullapalli's Report,

6   Defendant benefitted by cherry picking during the relevant period in the sum of $507,996

7   at the expense of his clients. (Report ¶¶ 58-60.) Defendant does not dispute Dr.

8   Gullapalli's analysis (JSUF ¶ 31) and has not raised a genuine issue of material fact

9   regarding cherry picking (*see* Section 1.a. above). Misuse of client funds is

10  circumstantial evidence of intent to defraud. *See United States v. Booth,* 309 F.3d 566,

11  575 (9th Cir. 2002).

12      Moreover, the SEC has provided undisputed evidence that Defendant was

13  repeatedly put on notice by third parties that his trading practices might be improper and

14  the representations he made to his clients misleading. On or about September 29, 2021,

15  TDA's Financial Risk Management representative Andrew Jones spoke with Mr. Werthe

16  because TDA's data showed preferential allocations to the Werthe Account. (JSUF

17  ¶ 34.) Defendant admits he was told that he should not trade on the same securities as his

18  clients on the same day "to avoid the scenario of [Defendant] receiving a better price."

19  (*Id.* ¶ 35.) Defendant was audited in the summer of 2021 by the California Department of

20  Financial Protection and Innovation ("DFPI"). (*Id.* ¶ 57.) In October 2021, DFPI

21  notified Defendant that it falsely stated in its March 23, 2020, Brochure that "HSR effects

22  transactions for each Client independently and does not aggregate trades." (ECF No. 26-

23  7, SEC Ex. C (Mar. 23, 2020, Brochure); ECF No. 26-16, SEC Ex. K (Oct. 12, 2021,

24  DFPI letter to Mr. Werthe).) In its letter, DFPI instructed Defendant to amend the

25  Brochure accordingly. (JSUF ¶ 57.) On or about October 21, 2021, TDA Adviser

26  Services Investigator Joshua Barkelew questioned Mr. Werthe about block trading,

27  allocations, and inconsistencies between the Brochures and his actual trading practices.

28  (*Id.* ¶ 37.) Mr. Werthe admitted to Mr. Barkelew that he was not keeping records of his

allocation decisions.  (*Id.* ¶ 39.)  On or about March 4, 2022, Mr. Barkelew confronted
Mr. Werthe that despite his assurances on October 21, 2021, he was still allocating day-
trades to the Werthe Account, it appeared that he was allocating less profitable trades to
the Client Accounts, and still failed to retain records of allocation decisions.  (*Id.* ¶¶ 41-
42.)

Moreover, Defendant admits that some statements he made to his clients were
false.  For example, Defendant admits that he falsely represented to his clients that he
was not trading on the same securities.  (JSUF ¶¶ 48-50.)  Beyond this admission,
Defendant was the sole person responsible for allocations from the Block Account and
the sole person responsible for the content and wording of the Brochures (*Id.* ¶¶ 9, 45.)

In opposition, Defendant quibbles about what precisely Messrs. Jones and
Barkelew said to him.  (*See* ECF No. 27, Def.'s Exs. D & E.)  These contentions are
inadequate in light of Defendant's subsequent admissions in the joint statement of
undisputed facts.

Defendant also offers his unsworn blanket protestation that he did not know that he
was doing anything wrong.  This is insufficient to raise a genuine issue of material fact.
*See Soto,* 882 F.3d at 872 (allegations not sufficient to oppose a summary judgment
motion).  Moreover, the false statements in the Brochures about not aggregating trades
and prioritizing client interests over his own were so patently false that no reasonable jury
could conclude that they were not knowingly or recklessly made.  *See Hollinger,* 914
F.2d at 1569 (danger of misleading "so obvious that the actor must have been aware of
it"); *Scott,* 550 U.S. at 380 ("blatantly contradicted by the record").

3.    Remaining Elements

Defendant admits that by purchasing and selling securities through the Block
Account, and allocating shares from the Block Account among the Werthe and Client
Accounts, he "used the means or instrumentalities of interstate commerce, of
the mails, or the facilities of a national securities exchange, and engaged in conduct
that was in connection with the offer, purchase, and sale of securities."  (JSUF ¶ 10.)

4.    Conclusion

The SEC has met its burden of production on every element necessary to prove liability under its Fraudulent Scheme Claims alleged under Section 10(b) of the Exchange Act, Rule 10b-5(a) and (c), and Section 17(a)(1) and (3) of the Securities Act.  Defendant has failed to raise a genuine issue of material fact regarding these claims.

**B.    The False Statement Claims**

The False Statement Claims are based on the statements in the Brochures as set forth in Section A.1.b. above.  The SEC alleges that these statements were made in violation of Section 10(b) of the Exchange Act, Rule 10b-5(b), and Section 17(a)(2).

Section 10(b) of the Exchange Act provides in relevant part:

Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—[¶]

(b) To use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5(b) provides in relevant part:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, [¶]

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading [¶]

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).  Section 17(a)(2) of the Securities Act provides:

19

23cv0815-L-DDL

Fraudulent interstate transactions

(a) Use of interstate commerce for purpose of fraud or deceit

It shall be unlawful for any person in the offer or sale of any securities … by the use of any means or instruments of … communication in interstate commerce or by use of the mails, directly or indirectly—[¶]

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]

15 U.S.C. § 77q(a)(2).

These provisions require proof of (1) material misrepresentation or omission; (2) in connection with the purchase, offer, or sale of a security; (3) through use of interstate commerce.  Proof of scienter is required for claims under Section 10(b) and Rule 10b-5(b), *Platforms Wireless,* 617 F.3d at 1092, while negligence is sufficient for the claim asserted under Section 17(a)(2), *Aaron,* 446 U.S. at 701-02.

The SEC provided undisputed evidence that Defendant's Brochures dated March 23, 2020, November 15, 2021, and March 15, 2022, contained false or misleading statements.  (*See* Section A.1.b. above.)  Defendant admits that he "reviewed, and had final control and authority over, the content and wording of these Brochures."  (JSUF ¶ 45.)  Accordingly, Defendant was the "maker" of these statements.  *See Janus Cap. Group v. First Derivative Traders,* 564 U.S. 135, 142 (2011).  Further, the SEC presented evidence that Defendant made the statements with scienter, and Defendant has failed to raise a genuine issue of material fact as to this element.  (*See* Section A.2. above.)  The Court therefore turns to the issue of materiality.

"It is indisputable that potential conflicts of interest are material facts with respect to clients[.]" *Vernazza v. SEC,* 327 F.3d 851, 859 (9th Cir. 2003).  Defendant does not dispute that the false representations in the Brochures concerned the issues whether he was trading in the same securities as his clients, whether he was aggregating trades, and

whether he placed his clients' interests before his own.  Dr. Gullapalli's Report and Supplemental Report show, and Defendant does not dispute, that Defendant traded in the same securities as his clients, used the Block Account for the vast majority of trades, allocated most of the profitable trades to his own account and most of the unprofitable trades to the Client Accounts, and earned a profit for himself at the expense of his clients. (*See* discussion in Section A.1. above.)  Had Defendant truthfully disclosed these practices in the Brochures, he would have disclosed a conflict of interest.  Accordingly, no genuine issue of material fact remains regarding the materiality of Defendant's false statements.

Finally, the false statements must be made by the use of interstate commerce "in connection with" the purchase, offer, or sale of a security.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b); 15 U.S.C. § 77q(a)(2).  "An instrumentality of interstate commerce includes the postal mails, e-mails, telephone, telegraph, telefax, interstate highway system, Internet and similar methods of communication and travel from one state to another within the United States."  Ninth Cir. Manual of Model Civ. Jury Instr. ("9th Cir. Civ. Jury Instr."), Instr. 18.1.  It is undisputed that Defendant distributed the Brochures to his clients.  (JSUF ¶ 44.)  Defendant does not dispute that he distributed them by the use of an instrumentality of interstate commerce.  "In connection with" means that there was some relationship between the false statement and the purchase, offer, or sale of a security.  *See* 9th Cir. Civ. Jury Instr. 18.1.  For example, this requirement is satisfied if an investor "suffered an injury as a result of deceptive practices touching its sale of securities[.]"  *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12-13 (1971).  It is undisputed that Defendant's false statements concealed his cherry-picking practice from his clients.  Accordingly, the statements were made "in connection with" Defendant's Block Account trading.

Based on the foregoing, the SEC has met its burden to produce evidence in support of its False Statement Claims alleged under Section 10(b) of the Exchange Act, Rule 10b-

/ / / / /

5(b), and Section 17(a)(2) of the Securities Act.  Defendant has failed to raise a genuine issue of material fact regarding these claims.

## C.    The Investment Adviser Claim

The SEC claims that Defendant's cherry picking, and false and misleading statements violated Section 206(1) and (2) of the Advisers Act.  These provisions state:

> Prohibited transactions by investment advisers
>
> It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or]
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]

15 U.S.C. § 80b-6(1) & (2).  Section 206 "establishes federal fiduciary standards to govern the conduct of investment advisers." *Transam. Mtg. Advisors, Inc. v. Lewis,* 404 U.S. 11, 17 (1979).  Scienter is required to establish liability under subsection (1), *Vernazza*, 327 F.3d at 860, while negligence is sufficient under subsection (2), *World Tree*, 43 F.4th at 460.

Defendant admits that he is a registered investment adviser.  (JSUF ¶ 1.)  The SEC has submitted evidence to show that Defendant engaged in a scheme to defraud his clients with the requisite scienter, and Defendant has failed to raise a genuine issue of material fact as to these elements.  (*See* discussion in Sections A.1. and 2. above.) Finally, Defendant admits that in conducting his fraudulent scheme, he used the means and instrumentalities of interstate commerce.  (JSUF ¶ 10.)

Based on the foregoing, the SEC has met its burden to produce evidence in support of liability under its Investment Adviser Claim alleged under Section 206 of the Advisers Act.  Defendant has failed to raise a genuine issue of material fact regarding this claim.

/ / / / /

23cv0815-L-DDL

III.   **CONCLUSION**

For the reasons stated above, the SEC's motion for summary adjudication of Defendant's liability under each cause of action alleged in the Complaint is granted.

**IT IS SO ORDERED.**

Dated:  March 12, 2025

_____
for   Hon. M. James Lorenz
United States District Judge

23cv0815-L-DDL